*Isaac Nutovic, Esq.*
*NUTOVIC & ASSOCIATES*
*261 Madison Avenue, 26th Floor*
*New York, New York 10016*
*(212) 421-9100*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re                                                                  Chapter 11

       4218 PARTNERS LLC

                                      Debtor        Case No. 19-44444(SHL)
-------------------------------------------------------X

## DEBTOR'S RESPONSE TO MAGUIRE FT. HAMILTON LLC MOTION TO DISMISS

TO THE HONORABLE NANCY H. LORD
UNITED STATES BANKRUPCTY JUDGE:

        The response of 4218 Partners LLC (the "Debtor") to the Motion of Maguire Ft. Hamilton LLC For Entry of an Order Dismissing the Debtor's Bankruptcy Case (the "Motion"), states as follows:

1.     In its Motion, Maguire Ft. Hamilton LLC ("Assignee") argues that the membership interests in the Debtor could not have been transferred by Pfeiffer and Krausz to 175 Pulaski RLM LLC ("Pulaski") in violation of their covenant not to transfer those interests or, alternatively, that the transfer could not have been effectuated because prior thereto the Assignee had "effectively registered its Membership Interests in its name." The Motion, at paragraph 4, argues that upon registration of the membership interests Assignee became vested with all rights and interests to the Membership Interests, "including all management and voting rights".

2.     The Motion should be denied for the following reasons: (a) the Assignee cites no authority for its central proposition that a transfer made in contravention of a promise not to make that transfer is void (b) explicit provisions of the New York Limited Liability Company

1

Law ("N.Y. LLC Law") provide that an assignment/pledge of a membership interest only transfers the member's economic rights; (c) the Assignee supplies no client affirmation to support its statement that it "registered" the membership interests in question prior to the transfer to the Member and (d) Assignee supplies no authority supporting the proposition that whatever action it took could have effectuated registration in its name and (e) as set forth in the Debtor's Complaint dated August 22, 2019 commencing adversary proceeding 19-01115, all of the loan and security documents are void as having been procured under economic duress.

**Facts**

3.      The Debtor is the owner of the property generally known as 4218 Fort Hamilton Parkway, Brooklyn, New York (the "Property").

3.      Pulaski holds the entirety of the membership interests in, and is the sole member of, the Debtor.

4.      The Debtor purchased the Property on November 19, 2018 (the "Purchase"). Assignee's predecessor-in-interest, Ice Lender XVII LLC ("ICE" or "Lender") provided financing for the Purchase in return for various loan documents, including a promissory note (the "Note") secured by a mortgage upon the Property (the "Mortgage"). In addition, ICE required the former members of the Debtor –Samuel Pfeiffer ("Pfeiffer") and his wife Dina Krausz ("Krausz" and, together with Pfeiffer, the "Original Members") – to execute a Pledge Agreement for their combined 100% membership interest in the Debtor (the "Pledge Agreement" and, together with the Mortgage and the Note, the "Loan Documents").

Facts Relating To The Purchase of the Property

5.      Pursuant to a contract dated December 12, 2017 (the "Sales Contract"), 6323 14th Holdings LLC ("Seller") and 4218 Fort Hamilton LLC ("Original Purchaser") agreed that

Original Purchaser would purchase the Property from Seller. The Sales Contract provided for a purchase price of $8,000,000 and for a time of the essence ("TOE") closing date of April 16, 2018.

6. Joseph Fischman ("Fischman") owned 100% of the membership interests in Original Purchaser. Because Pfeiffer owned land adjacent to the Property (the "Adjoining Property") Fischman "flipped" the Sales Contract to the Debtor. As the former owner of both the Property and the Adjoining Property, Pfeiffer intended to build one single development upon both the Property and the Adjoining Property.

7. Seller amended the Sales Contract seven times, with the seventh amendment (the "Seventh Amendment") extending the TOE closing date to November 19, 2019, increasing the purchase price under the Sales Contract to $8,578,000, and substituting the Debtor as the purchaser.

8. Fischman also owned certain development rights (the "Air Rights") in an adjacent property and transferred the Air Rights to the Debtor so as to increase the Property's value. See Affirmation of Joseph Fischman submitted herewith (the "Fischman Affirmation"). The Debtor agreed to pay to Fischman a total of $2,000,000 in consideration for assigning the Contract and transferring the Air Rights.

9. The Seventh Amendment provided that failure by the Debtor to close on the TOE closing date would result in Seller retaining both (i) the deposit already paid in the amount of $1,250,000, and (ii) the entirety of the Air Rights transferred to the Property.

10. So as to enable the Debtor to pay the Sales Contract price and the monthly interest payments, ICE and the Debtor executed a binding commitment the (the "Commitment") pursuant to which ICE committed to fund a total of $9,000,000. **See Exhibit A**. The loan was to be repaid

in eighteen months. Since ICE was escrowing the last nine months of interest payments, the Debtor would only have to make the first nine monthly payments of $82,500 each, See Affirmation of Samuel Pfeiffer submitted herewith (the "Pfeiffer Affirmation").

<u>The Loan Documents Were Executed Under Economic Duress</u>

11. Being aware of the fact that Monday, November 19, 2018 was the TOE closing date under the Sales Contract, ICE intentionally permitted the Debtor to rely on the Commitment until Friday, November 16, 2018 – one business day prior to the TOE closing date under the Sales Contract. On that Friday, ICE unlawfully threatened to refuse any funding unless the Note was reduced to $8,250,000.

12. At that point, ICE knew that the Debtor could not possibly secure alternative financing in time for the TOE closing date and would have no choice but to accept the reduction rather than suffer even worse and more immediate severe harm. As discussed, failure to close would mean the immediate guaranteed loss of both the $1,250,000 deposit and the valuable Air Rights; and Fischman would still be owed the full $2,000,000 for assigning the Contract and the Air Rights.

13. Faced with ICE's wrongful refusal to fulfill the Commitment, and in light of the significant economic consequences of refusing to sign the Loan Documents, the Debtor, Pfeiffer and Krausz executed the Loan Documents and provided their personal guaranties under extreme economic duress.

14. The Original Members executed a pledge of their Membership Interests pursuant to a Membership Interest Pledge Agreement (the "Pledge Agreement"), a copy of which is annexed as **Exhibit B**.

15. The Original Members also executed an Assignment of Interest in blank attaching purported Membership Certificates in the Debtor. Copies of these documents are annexed

collectively as **Exhibit C**.

16. Without the additional $750,000 it was supposed to get pursuant to the Commitment, the Debtor was not able to make the monthly payments and defaulted on the loan to ICE.

17. Assignee asserts ICE assigned its interest in the Loan Documents to Assignee.

18. On March 18, 2019, Assignee sent a letter to the Debtor advising that it was in default under the Note and Mortgage. The only action taken by Assignee rported in the letter was that Assignee had accelerated the Loan. No letter was sent to the Original Members. No Membership Certificate was presented to the Debtor and no request was made to the Debtor to register the Membership Certificates in Assignee's name.

19. Assignee subsequently sent the Debtor and the Original Members a Notification of Disposition of Collateral and several amendments thereto referring to the Membership Interests as part of the "Pledged Collateral". They were never identified as having been assigned to Assignee.

20. On June 26, 2019 the Original Members transferred their Membership Interests to Pulaski for value (the "<u>Pulaski Transfers</u>"). See Fischman Affirmation. **Exhibit D.**

  A.  <u>The Transfer to Pulaski In Violation Of A<br>Covenant Not to Transfer Is Not Voidable</u>

21. Assignee asserts, without any statutory or case support, that the Pulaski Transfers are void because the Original Members had, in the Pledge Agreement, promised not to transfer their Membership Interests.

22. The relevant section of the Pledge Agreement reads as follows:

> Pledgor shall not (i) sell, transfer, pledge, assign, hypothecate or otherwise dispose of, or grant any option with respect to, any of the Collateral or the Membership Interests without the prior written consent of Lender, which may be withheld in

Lender's sole discretion, or (ii) create or permit to exist any lien, security interest, additional debt or other charge or encumbrance upon or with respect to any of the Collateral or the Membership Interests, except for the security interest granted under this Pledge without the prior written consent of Lender. A default by Pledgor to this Section 6 shall constitute an immediate Event of Default hereunder and under the Note and shall not require any notice of default to be delivered to Pledgor by Lender.

23. New York law on this question is not in dispute.

> "[I]t has been consistently held that assignments made in contravention of a prohibition clause in a contract are void if the contract contains clear, definite and appropriate language declaring the invalidity of such assignments (Allhusen v Caristo Constr. Corp., 303 NY 446; State Bank v Central Mercantile Bank, 248 NY 428, 435; Empire Discount Corp. v Bouley Co., 5 Misc 2d 228; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395). On the other hand, where the language employed constitutes merely a personal covenant against assignments, an assignment made in violation of such covenant gives rise only to a claim for damages against the assignor for violation of the covenant ( Sacks v Neptune Meter Co., 144 Misc 70, 79, affd 238 App Div 82; Manchester v Kendall, 19 Jones & Sp 460, affd 103 NY 638; Empire Discount Corp. v Bouley Co., supra)."

*Sullivan v. Int'l Fid. Ins. Co.*, 96 A.D.2d 555, 556, 465 N.Y.S.2d 235, 237-38 (App. Div. 1983.

24. The Pledge Agreement nowhere specifies that a transfer or assignment made in violation of the Pledge Agreement is void. Indeed, a contrary inference can be drawn since the agreement only specifies that the consequence of such a violation is an immediate Event of Default not requiring the lender to deliver any notice of the default. If the transfer were ineffective there would be no need for a default. Nothing would have happened. Under New York law the Pulaski Transfers were not rendered voidable by the Pledge Agreement since it did not contain specific language declaring such transaction void.

B.     Assignee Has Not Demonstrated It Divested the Guarantors of
<u>Their Rights to Transfer Their Membership Interests</u>.

25.     The fundamental problem with Assignee's argument is that it is premised on the notion that it can contractually override statutory law. It presumes that Assignee can bypass all of the protections of the N.Y. UCC by having a borrower execute a contract. Assignee cannot argue that the Event of Default (and the typing in of a name on a blank Assignment document) effectuated a transfer of the Membership Interests. The original Members could, and did, transfer them to Pulaski for value before any N.Y. UCC controlled sale.

26.     To the extent that Assignee claims it stripped Pfeiffer and Krausz of the full extent of rights normally associated with Membership Interests prior to the transfer to Pulaski, it is up to Assignee to establish that it had the legal right to do so and acted on that right. It has not established its case.

27.     Section 603(a) of the New York Limited Liability Company Law provides:

> "(a) Except as provided in the operating agreement,
>
> (1) a membership interest is assignable in whole or in part;
>
> (2) an assignment of a membership interest does not dissolve a limited liability company or entitle the assignee to participate in the management and affairs of the limited liability company or to become or to exercise any rights or powers of a member;
>
> (3) *the only effect of an assignment of a membership interest is to entitle the assignee to receive, to the extent assigned, the distributions and allocations of profits and losses to which the assignor would be entitled*; and
>
> (4) a member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of his or her membership interest. Unless otherwise provided in the operating agreement, the pledge of, or the granting of a security interest, lien or other encumbrance in or against, any or all of the membership interest of a member *shall not cause the member to cease to be a member or to cease to have the power to exercise any rights or powers of a member."* (emphasis supplied)

28.     New York law plainly states that unless provided for in the operating agreement, the

7

assignment of a membership interest only entitles the assignee to receive the distributions and allocation of profits and losses and does not divest the member of any powers or rights. Only when "all of his or her membership interest" assigned does the member cease to be recognized as a member. The word "all" is not superfluous; it contemplates scenarios where not all interests are assigned i.e. when the assignment is made as a pledge or when the operating agreement does not explicitly provide for all interests to be transferred. Since the Operating Agreement contains no provisions which divested the Original Members of any of their rights, they were free to transfer those rights to Pulaski and they were free to exercise those rights to authorize the filing of the Debtor's bankruptcy case. (See also N.Y. LLC Law §604(a): " Except as provided in the operating agreement, an assignee of a membership interest may not become a member without the vote or written consent of at least a majority in interest of the members, other than the member who assigned or proposes to assign such membership interest.")

29.     In contravention of this legislative directive and without any legal support, Assignee impermissibly relies on the contractual terms of the Pledge Agreement for its argument. But even the terms of the Pledge Agreement do not support its position. The Agreement does not state anywhere that the Original Members lost any rights upon the happening of an Event of Default. The agreement provides only that upon an Event of Default, all Membership Interests "at Lender's option" may be registered in the name of the Lender and that only "thereafter" the Lender *may* exercise all ownership rights. However, the document does not state that once the Lender opts to register the Membership Interests in its name the Original Members are excluded from exercising rights not exercised by the Lender. The agreement says only that Lender "may" exercise those rights; it does not say what will happen if the Lender elects <u>not</u> to exercise those rights. Nowhere does the Pledge Agreement say that once registration occurs the Original

Members are prohibited from exercising any voting or other rights associated with the Membership Interests.

### C. The Membership Interests Were Not Transferred to Assignee When it Typed its Name Onto the Assignment of Interest Document

30. Again without any factual or legal support, Assignee argues that by someone typing in its name on the Assignment of Interest portion of the Membership Certificate, on an unspecified date, it "effectively registered the Membership Interests in its name". There is no affidavit in support of the Motion which sheds light on two critical missing pieces of information—who typed in Assignee's name and when it was done. Clearly if it was done after the Membership Interests were transferred to Pulaski that would be not have prevented the Pulaski Transfers. Assignee does not affirmatively state that this act was done before the transfer to Pulaski. The timing of the alleged registration has not been established.

31. Even if the name was typed in before the transfer, Assignee cites nothing which even suggests that by doing so Assignee "registered" its interest. It is the duty of an "issuer" to register transfers. See § 8-401of the New York Uniform Commercial Code ("UCC"). UCC 8-§201(c) states: "With respect to a registration of a transfer, issuer means a person on whose behalf transfer books are maintained." Surely Assignee cannot be arguing that transfer books are maintained on its behalf. In this case it is the Debtor who is the issuer of membership interests—not the Assignee.

32. Section 5 of the Pledge Agreement also provides that "all Membership Interests …. *may* be registered in the name of the Lender" (emphasis supplied). It is not automatic. Assignee does not claim it made a request to register the certificates in question. Assignee's argument that it "effectively" registered itself as the owner of the Membership Interests fails.

33. The Assignee's attempt to assign the Membership Interest to itself is in any event

ineffective by terms of the Membership Certificate itself. The Membership Certificate specifically provides:

"Transfer of any or all of the limited liability company interests in the Company evidenced by this Membership Certificate is subject to certain restrictions contained in the limited liability company agreement and can be effected only after compliance with all of those restrictions *and the presentation to the company of the Membership Certificate*…." (emphasis supplied)

34. Assignee makes no claim that it presented the Membership Certificate to the Debtor at any time. Further, transfer is conditioned upon compliance with all of the restrictions in the "limited liability company agreement". The Debtor's Operating Agreement in effect as of March 18, 2019 is annexed as **Exhibit E**. Paragraph 12 of that agreement provides that no member may transfer any of its interest in the company without the written consent of the Manager. The written consent of the Manager to the transfer to the Assignee was not obtained prior to the alleged transfer to the Assignee.

35. The putative transfer of the Membership Interests are also void as being in violation of an explicit provision in the N.Y. LLC Law. Section 603(b) provides:

> …….The existence of the restrictions on the sale or transfer of a membership interest, as contained in this chapter and, if applicable, in the operating agreement, shall be noted conspicuously on the face or back of every certificate representing a membership interest issued by a limited liability company.   Any sale or transfer in violation of such restrictions shall be void.

The Membership Certificate references only the restrictions in the Operating Agreement without mentioning the restrictions contained in the statutory law. Consequently any transfer of that certificate was void.

D.     The Lender Did Not Even Properly Perfect Its Security Interest
         <u>In the Membership Interests So as To Provide Notice Of Its Rights.</u>

36. Neither the Lender not the Assignee filed UCC financing statements against the Original Members. They appeared to be relying on statutory provisions which allow for physical control

of a certificated security which does not apply if the Membership Interests are considered to be "general intangibles" under the N.Y. UCC.

37.     The Membership Certificate states:

> "The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company or set forth in, and this membership certificates and the limited liability company interests In the company represented here by or issued an shell in all respects be subject to the terms and provisions of, that certain limited liability company agreement of the company, dated as of August 31, 2018, as the same may have been in may hereafter be amended, modified, supplemented, or restated from time to time …"

The operating agreement was in fact amended and restated as of June 26, 2019. A copy of the amended and restated operating agreement is annexed as **Exhibit F**. Paragraph 7 of the amended operating agreement specifies that each membership interest is a general intangible as the term is understood by Article 9 of the New York Uniform Commercial Code. Accordingly, since at the time of the commencement of this case no UCC financing statement was on file, Lender's security interest in the Membership Interests is unperfected.

38.     Furthermore, neither the Operating Agreement nor the Amended Operating Agreement provide for certificates to be issued evidencing membership interests. §603(b) of the N.Y. LLC Law states that an operating agreement "may provide that a member's interest may be evidenced by a certificate issued by the limited liability company…" There is no need for this statutory clause if certificates could be issued even if the operating agreement did not so provide. The implication is that without such a provision there can be no certificates. Since the Debtor's Operating Agreement did not authorize membership certificates, Assignee's reliance on them could not perfect its security interest.

39.     Certainly, no creditor or transferee would be on constructive notice of the existence of such a certificate without such a provision in the Debtor's operating agreement or without the

filing of a UCC financing statement.

E. The Loan Documents Are Voidable Having Been Executed Under Economic Duress

39. Under New York law, the elements of a claim of "economic duress" are: (1) a threat, (2) which was unlawfully made, (3) and caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative. <u>Kamerman v. Steinberg</u>, 891 F.2d 424, 431 (2d Cir. 1989) (citing <u>Gulf & Western Corp. v. Craftique Prods</u>., 523 F. Supp. 603, 610 (S.D.N.Y. 1981)). A contract is "voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." <u>Austin Instrument v. Loral Corp</u>., 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533 (N.Y. Ct. of App. 1971). See <u>National Trends v. Krimson Corp</u>., No. 91 Civ. 3178 (KMW), 1994 WL 97058 at *22 (S.D.N.Y. Mar. 23, 1994).

40. All four elements of the duress claim are met here. ICE threatened not to fund at all; the threat was unlawful because ICE had a binding Commitment to do so; the terms of the Loan Documents were involuntarily accepted under circumstances permitting no reasonable alternative. As a result, the Loan Documents should be voided, and the Assignee should be left with nothing more than an unsecured claim for the return of its monies.

[INTENTIONALLY LEFT BLANK]

## Conclusion

41. For all of the foregoing reasons, the Motion should be denied, and the Debtor should be awarded such other and further relief as to this Court seems just.

Dated: New York, New York
      September 26, 2019

                            NUTOVIC & ASSOCIATES
                            Attorneys for Debtor
                            By: _s/ Isaac Nutovic_
                                  Isaac Nutovic, Esq.
                            261 Madison Ave, 26th Floor
                            New York, New York 10016
                            Tel: (212) 421-9100